IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | | |
|---|---|---|
| JORE CORPORATION | ) | CV 12-126-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| | ) | |
| DRILLCRAFT TOOLS | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

FILED
SEP 1 0 2012
PATRICK E. DUFFY, CLERK
By_____
DEPUTY CLERK, MISSOULA

Two issues are before the Court: Plaintiff's motion for a preliminary injunction and its motion to voluntarily dismiss Count Four of its complaint, which asserts a claim under the Montana Unfair Trade Practices and Consumer Protection Act.

This matter was referred to United States Magistrate Judge Keith Strong for the limited purpose of conducting a hearing on the pending motion for a preliminary injunction. Judge Strong entered Findings of Fact and Conclusions of Law (doc. 59) in open court at the conclusion of the hearing, and he recommended that the motion be denied. Plaintiff Jore Corporation ("Jore") and Defendant Drillcraft Tools Corporation ("Drillcraft") have both filed objections (docs. 64, 65) and are entitled to de novo review of the findings or recommendations to

which they object. 28 U.S.C. § 636(b)(1). However, several objections raised by the parties are not addressed because it is unnecessary to reach all the issues in dispute in order to decide this motion. For the reasons stated below, Judge Strong's findings are adopted in part and rejected in part, keeping in mind Judge Strong's admonition that none of the conclusions are the law of the case or res judicata. Judge Strong's recommendation to deny Jore's motion is adopted in full. I do not believe a preliminary injunction is warranted based on the current record. This determination does not preclude an alternate course if a trial dictates otherwise.

## FACTUAL BACKGROUND

Jore and Drillcraft have worked together since at least September 2004, when the demand for Jore's products evidently began to exceed its ability to produce all its products itself. Drillcraft has produced various sets of drill and driver bits for Jore. Both Jore and Drillcraft also work with other companies. Generally, Jore is hired by a name-brand company like Makita, Hitachi, or Evolv to design a product. The design process mainly involves Jore employees. The process starts with the Jore marketing department, which works with customers to determine a specific "branding" look and customer specifications. The design ideas are then submitted to a Jore graphics group that develops the concepts into

2

two-dimensional illustrations. Design engineers then become involved, developing 3-D modeling and computer-aided design data (CAD) for the products. At this point, Jore involves the vendor—in this case Drillcraft. Drillcraft then designs and builds the tooling and molds for the products, typically according to designs Jore developed during the design process. Jore shares pictures, CAD files, and comments with Drillcraft in order to ensure that the products are consistent with its specifications. Either Drillcraft or its subcontractor in China, Danyang Chenglin, develop and pay for the tooling used to create the products, although Jore believes that its purchase price includes some of the cost of the tooling.

For example, Drillcraft produced a 55-piece set for Jore that Jore sold to Lowe's under the Kobalt brand name. Jore also claims to have sent Drillcraft designs for a six-piece set, which it never ordered because both Hitachi and Lowe's declined to purchase the item. In 2009, Jore was hired by the name-brand company Makita to design 62-piece and 38-piece drill and driver sets. By email, Jore sent Requests for Quotations (RFQs) to Drillcraft for these sets, along with Terms and Conditions indicating Drillcraft was required to protect Jore's confidential information. Drillcraft won the bid, but does not appear to have signed the Terms and Conditions contained in the email. It is unclear from the record which company designed the cases for the 38-piece and 62-piece sets; both

parties claim responsibility. Drillcraft insists its design engineer made significant changes to the designs that Jore originally proposed.

According to Jore, Makita later entered into an exclusive contract with Home Depot for a 70-piece drill and driver set. Jore based the design for this set on the earlier 62-piece set—the only difference was the labeling and the addition of eight extra bits. Jore asked Drillcraft to produce the set using the tooling made for the 62-piece set. The Makita sets were then sold at Home Depot.

At some point, Drillcraft and its subcontractor in China began using at least some of the tooling it had developed pursuant to its relationship with Jore to produce "essentially identical" products. It produced a 70-piece drill and driver bit set for Lowe's under the Kobalt brand name that is identical in all but labeling, color, and name to the 70-piece drill and driver bit set that it had produced for Jore under the Makita brand name a year earlier. When Home Depot discovered the nearly identical set being sold at Lowe's, it threatened to remove all Makita products from Home Depot, and in turn, Makita threatened to sue Jore, accusing Jore of being "in cahoots" with Drillcraft.

Drillcraft also re-used tooling that it had originally created to make the external case housing for the 55-piece set that Jore sold to Lowe's. It used the tooling to make the external case housing for a 44-piece set that Drillcraft sold to

4

Lowe's. Shao indicates that this case design is owned by Lowe's, even if Jore helped develop the design. Drillcraft also sold to Lowe's a 6-piece drill bit set that Jore attests is similar or identical to the 6-piece product concept that Jore had shared with Drillcraft, but did not ultimately order.

Jore seeks a preliminary injunction precluding Drillcraft from selling any products derived from designs Jore shared with Drillcraft. The claims raised include trade dress infringement, which Jore has moved to voluntarily dismiss on the grounds that it is duplicative of other claims, intentional interference with business relations, breach of contract, unfair trade practices under Montana Code Annotated § 30-14-101, *et seq.*, unjust enrichment, and conversion. Doc. 1 at 19–21.

## ANALYSIS

The party seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm if the preliminary injunction is denied, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). If a plaintiff can raise "serious questions going to the merits" and "demonstrate a balance of hardships that tips sharply towards the plaintiff," the plaintiff is entitled to a temporary restraining

order "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## I. Likelihood of success on the merits

Because Jore has not established a likelihood of success on the merits of its claims, its motion for a preliminary injunction is denied.

### A. Trade Dress Infringement

The standard set out in *Leatherman Tool Group v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999), most likely precludes Jore's success on its trade dress infringement claim. Jore argues that Judge Strong ignored evidence of a non-functional trade dress. "Distinctiveness" is among several variables Jore considers when designing a product case or case insert. But even if distinctiveness can be achieved through the selection of components used in a particular case, the number of components, the positioning of each component, the orientation of the components, and the shape and dimensions of the inserts, the "entire design must be nonfunctional" in order "for an overall product configuration to be recognized as a trademark." *Leatherman Tool Group*, 199 F.3d at 1012 (citing *Textron, Inc. v. U.S. Intl. Trade Commn.*, 753 F.2d 1019, 1025 (Fed. Cir. 1985)). "[W]here the whole is nothing other than the assemblage of functional parts, and where even the

arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional." *Id.* at 1013.

Jore has not presented evidence to overcome this standard, and indeed the functionality of each component and the arrangement itself is reiterated throughout the trial testimony, declarations, and affidavits. Jore also objects to Judge Strong's finding that the product case inserts make the products more valuable to customers. Doc. 64 at 8. However, Jore's own design engineer states that a product's case design contributes to "functionality, durability, ergonomic compatibility, cost, and distinctiveness at the very least." Decl. Cantlon, doc. 11 at 2–3. It is certainly reasonable to find that these factors contribute to a product's value. Jore has not shown that its "trade dress" is anything more than "unique arrangements of purely functional features." *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987) (internal quotation marks and citation omitted). Accordingly, Judge Strong's findings and conclusion on this issue are adopted.

**B.  Breach of Contract**

Jore has not shown a likelihood it will prevail on its breach of contract claim because there is insufficient evidence to support a finding that the Terms and Conditions (doc. 1-1) constituted a valid contract that existed between the

parties at the relevant times in this dispute. The alleged contract in the case is a document entitled "Terms and Conditions" that appears more than once in the record. E.g. doc. 1-1. Two paragraphs of the Terms and Conditions are relevant here. Paragraph 2 of the Terms and Conditions provides:

> If Goods are manufactured with reference to Jore Corporation's proprietary information or materials, Seller [(Drillcraft)] agrees that, pursuant to the "Confidential, Proprietary and Trade Secrets Information and Materials" article of this contract, it will not sell or offer such Goods for sale to anyone other than Jore Corporation without Jore's prior written consent.

Paragraph 22 restricts Drillcraft's use and disclosure of "Proprietary Information and Materials."[1] "Proprietary Materials," as defined in section (ii) of Paragraph

---

[1] In relevant part, paragraph 22 reads: "CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION AND MATERIALS: Jore Corporation and Seller shall each keep confidential and protect from unauthorized use and disclosure all (i) confidential information, and (ii) tooling identified as being subject to this clause and obtained, directly or indirectly, from the other in connection with this contract or other agreement referencing this contract (collectively referred to as "Proprietary Information and Materials"). Jore Corporation and Seller shall each use Proprietary Information and Materials of the other only in performance of and for the purpose of this contract and/or any other agreement referencing this contract. . . . The restrictions on disclosure or use of Proprietary Information and Materials by Seller shall apply to all materials derived by Seller or others from Jore Corporation's Proprietary Information and Materials. Upon Jore Corporation's request at any time, and in any event upon the completion, termination or cancellation of this contract, Seller shall return to Jore Corporation all of Jore Corporation's Proprietary Information and Materials and all materials derived there from, unless specifically directed otherwise in writing by Jore Corporation. Seller shall not, without the prior written authorization of Jore Corporation, sell or otherwise dispose of (as scrap or otherwise) any parts or other materials containing, conveying, embodying or made in accordance with or by reference to any Proprietary Information and Materials of Jore Corporation. Prior to disposing of such parts or other materials as scrap, Seller shall render them unusable. Jore Corporation shall have the right to audit Seller's compliance with this article. Seller may disclose Proprietary Information and Materials of Jore Corporation to its subcontractors as required for the performance of this contract, provided that each such subcontractor first agrees in writing to

8

22, are not at issue here because there is no evidence that any tooling was ever "identified as being subject to this clause." But three other restrictions in Paragraph 22 may apply. First, Paragraph 22 prohibits Drillcraft from using or disclosing "all confidential information" ("Proprietary Information") except in connection with its contract with Jore. Second, the contract prohibits Drillcraft from using or disclosing "all materials derived from" Jore's Proprietary Information. *Id.* Third, Drillcraft is prohibited from "sell[ing] . . . any parts or other materials containing, conveying, embodying or made in accordance with or by reference to any Proprietary Information." *Id.* Subcontractors are similarly bound, and the restrictions survive the performance and even the cancellation of the contract. *Id.*

Via email in March 2010, Jore asked Drillcraft to "again" agree to these Terms and Conditions. Both Drillcraft President Sony Shao and "Vice President"[2] Linny Buck were copied on the email. The Jore representative stated that

---

the same obligations imposed upon Seller under this article relating to Proprietary Information and Material. Seller shall be liable to Jore Corporation for any breach of such obligation by such subcontractor. The provisions of this article are effective in lieu of any restrictive legends or notices applied to Proprietary Information Materials [sic]. The provisions of this article shall survive the performance, completion, termination or cancellation of this contract." Doc. I-1 at ¶ 22.

[2] At the hearing, Shao insisted that Buck, who is deceased, was not Vice-President, but merely an independent contractor-salesperson. However, Shao was copied on emails where Buck's signature line stated she was Vice-President, and he did not correct any misconception that might have resulted. Hrg. Transcr. 169:24–170:12.

9

Drillcraft's agreement was required in order for the two companies to do business. He indicated that he understood that Drillcraft had signed a copy of the same terms "five or six" years earlier, but that it could not be located. Buck signed the Terms and Conditions and faxed them back to Jore on March 10, 2010. In an email, she stated: "We have no issues or questions about the terms and conditions."

No earlier, signed version of the Terms and Conditions is in the record, but two identical, unsigned copies are attached to the 2009 email from Jore to Drillcraft containing the RFQs for the Makita 38- and 62-piece sets. Jore testified that it was standard practice to send the Terms and Conditions along with new RFQs, and that it would not have pressured Drillcraft to return a signed copy because Drillcraft had already signed one and was already under contract with Jore. However, Shao denies that Drillcraft ever signed any Terms and Conditions, and further testified that he believed the Terms and Conditions only applied to the proposed Consignment Agreement that was discussed in the 2010 email, which Drillcraft did not ultimately agree to.

Jore's breach of contract claim requires that there be a valid contract and that Drillcraft violated that contract. There is insufficient evidence to conclude that Drillcraft was likely bound by the Terms and Conditions when it produced any of the drill bit sets in question. Even if there were an earlier, signed copy of

10

the Terms and Conditions, it is not apparent that the provisions would apply, once signed, to all future dealings between the parties. Accordingly, it is unnecessary to reach the question of whether any of the specific provisions in the Terms and Conditions were violated, although it appears at this point that if there were a contract, sections (i) and (ii) of Paragraph 22 would not apply to the dealings here, but the derivative clauses in Paragraphs 2 and 22 might. The record also casts doubt on whether the 62-piece set, upon which the 70-piece sets were based, was designed in accordance with any of Jore's proprietary information, and the record similarly lacks detail on the origin of the 6-piece set. Based on the current record, Jore has failed to show a likelihood of succeeding on its breach of contract claim.

### C. Other Claims

Jore did not address its claims of unjust enrichment or conversion in its motion for a temporary restraining order or its motion for a preliminary injunction, and its intentional interference claim is insufficiently developed at this point to support injunctive relief.

## II. Conclusion

Because Jore has failed to show a likelihood of success on the merits of its claims, its motion for a preliminary injunction fails even though I do believe the public has a strong interest in supporting fair and honest competition, *Pyro*

*Spectaculars N., Inc. v. Souza*, ___ F. Supp. 2d ___, 2012 WL 968084, *11–12 (E.D. Cal. Mar. 21, 2012); Mont. Code Ann. § 30-14-201, and in upholding valid contracts, particularly where they may be enforced by specific performance, *H & R Block Tax Servs. LLC v. Kutzman*, 681 F. Supp. 2d (D. Mont. 2010); Mont. Code Ann. § 27-19-103(5). Nor is an injunction warranted based on "serious questions going to the merits" of the claims because the balance of harms does not tip heavily in either party's favor.

Accordingly, IT IS HEREBY ORDERED:

1. Judge Strong's Findings of Fact and Conclusions of Law are ADOPTED in part and REJECTED in part, and his Recommendation (doc. 59) is ADOPTED in full.

2. Jore's Motion for a Preliminary Injunction (doc. 7) is DENIED.

3. Jore's unopposed motion to voluntarily dismiss Count Four of its Complaint (doc. 67) is GRANTED. Count Four of Jore's Complaint is DISMISSED WITH PREJUDICE.

4. Drillcraft's Motion to Dismiss the same count (doc. 51) is DENIED as moot.

Dated this _10_ day of September 2012.

/s/ Donald W. Molloy   11:24 am
_____
Donald W. Molloy, District Judge
United States District Court